## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE No.:

JUSTIN HUTTON, as Guardian of
JEREMY HUTTON, an incompetent person

        Plaintiff

vs.

JASON FRANQUI, in his Individual Capacity;
JOSEPH STACHELEK in his Individual
Capacity; KEITH BENDER, in his Individual
Capacity; and PALM BEACH COUNTY
SHERIFF'S OFFICE [Ric L. Bradshaw, in his
capacity as Sheriff of Palm Beach County, Florida] .

        Defendants.

_____/

## PLAINTIFF'S COMPLAINT

Comes Now, the Plaintiff, JUSTIN HUTTON, as Guardian of JEREMY HUTTON, a severely mentally disabled and incompetent person, (hereinafter "JEREMY") by and through the undersigned attorneys and hereby files his Complaint against JASON FRANQUI, in his Individual Capacity; (hereinafter "FRANQUI") JOSEPH STACHELEK in his Individual Capacity; (hereinafter "STACHELEK") KEITH BENDER, in his Individual Capacity; (hereinafter "BENDER") for acts that occurred during the course and scope of their employment with Defendant, the PALM BEACH COUNTY SHERIFF'S OFFICE [Ric L. Bradshaw, in his capacity as Sheriff of Palm Beach County, Florida] (hereinafter "PBSO").

## INTRODUCTION

This case involves another in a long line of unjustified police shootings by officers of PBSO

in which FRANQUI, STACHELEK, and BENDER, acted consistent with PBSO practices, policies, procedures, and customs of condoning aggressive police tactics, failing to identify, train, discipline, or otherwise properly supervise officers who have engaged in excessive and unjustified use of force on mentally ill/handicapped persons, and ratifying the conduct of those deputies with little or no investigation. This civil action arises from an incident that occurred on October 10, 2010, following the shooting and subsequent use of excessive force during the unlawful arrest of JEREMY HUTTON, a 17 year old male who suffers from Down Syndrome and is severely mentally disabled, has been legally declared incompetent.

The Plaintiff brings federal constitutional claims against FRANQUI, in his Individual Capacity; STACHELEK in his Individual Capacity; BENDER, in his Individual Capacity; for committing acts, under color of law, which deprived Plaintiff of his rights under the Constitution and the laws of the State of Florida by shooting and using excessive and unreasonable force during the arrest of the Plaintiff. Further, Plaintiff brings federal constitutional claims against PBSO as the supervisory entity responsible for the conduct, training, and supervision of the Sheriff's Deputies under its charge. Defendant, PBSO, failed to properly train Sheriff's Deputies in the appropriate methods, proper procedures, and protocols with respect to how to interact and subdue a mentally disabled and incompetent individual. Defendant, PBSO, had a policy and custom that constituted deliberate indifference to Plaintiff's Constitutional rights, and Defendant PBSO's, policy and custom deprived Plaintiff of his rights under the Constitution and the laws of the State of Florida resulting in the use of excessive and unreasonable force during the arrest of Plaintiff.

Additionally, Plaintiff brings a Negligent Retention claim against PBSO for retaining Defendants FRANQUI, STACHELEK and BENDER, despite their history of internal affairs

complaints, a Negligent Use of a Firearm claim against PBSO as a result of Defendant FRANQUI handling of his firearm and his negligent decision to use a firearm as to Plaintiff, and an ADA Title II claim against PBSO for failing to train and have a policy in place to interact with and provide services to developmentally disabled/mentally handicapped individuals. Plaintiff brings Battery claims against Defendants FRANQUI, BENDER, and PBSO for the intentional, unwelcome, and unprivileged touching of Plaintiff which caused him serious bodily injuries. Lastly, Plaintiff brings False Arrest/Imprisonment Claims against Defendants FRANQUI and PBSO and a Malicious Prosecution Claim against Defendant Franqui for causing the unconstitutional arrest of and institution of criminal proceedings against Plaintiff who as a result of his Down Syndrome and severe mental disability lacked the requisite intent to be arrested and prosecuted for any of the alleged crimes.

## JURISDICTION AND VENUE

1.      Plaintiff in this action seeks relief under the Fourth and Fourteenth Amendments of the United States Constitution, and the Civil Rights Act of 1871, 42 U.S.C. §1983, including compensatory damages, punitive damages, costs and attorney's fees pursuant to 42 U.S.C. §1988 and the Americans with Disability Act ("ADA") pursuant to 28 U.S.C. §1331.

2.      Venue is proper in the Southern District Court of Florida pursuant to 28 U.S.C. §1391(b) as all defendants work and/or reside in this district and all of the acts and omissions giving rise to this action occurred in Palm Beach County.

3.      The Court has federal question jurisdiction over PLAINTIFF's federal law claims pursuant to 28 U.S.C. §§1331 and 1343(a)(3).  PLAINTIFF'S state law claims are related to these federal claims and form a part of the same case or controversy. The Court accordingly has

supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

4.     All conditions precedent to the maintenance of this action, including those set forth in Florida Statute 768.28, have been performed, have occurred prior to its institution, or have been waived.

## PARTIES

5.     At all times material hereto JUSTIN HUTTON as Guardian of JEREMY HUTTON, a severely mentally disabled and incompetent person, is and was a citizen and resident of Palm Beach County, State of Florida and is otherwise sui juris.

6.     At all times material hereto Defendant JASON FRANQUI, was employed as a sworn law enforcement officer for the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE, and was acting under the direction and control of the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE, in such capacity as an agent, servant and employee of the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE.  Upon information and belief, and at all times material hereto, Defendant FRANQUI participated in the constitutional violations and other wrongful acts that occurred on October 10, 2010, at which time he was acting within the course and scope of his employment under color of state law.  Defendant FRANQUI is and was a citizen of the State of Florida and is otherwise sui juris.

7.     At all times material hereto Defendant JOSEPH STACHELEK, was employed as a sworn law enforcement officer for the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE, and was acting under the direction and control of the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE, in such capacity as an agent, servant and employee of the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE.  Upon information and belief, and at all times material

hereto, Defendant STACHELEK observed the constitutional violations and other wrongful acts that occurred on October 10, 2010, and failed to intervene at which time he was acting within the course and scope of his employment under color of state law. Defendant STACHELEK, is and was a citizen of the State of Florida and is otherwise sui juris.

8.      At all times material hereto Defendant KEITH BENDER, was employed as a sworn law enforcement officer for the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE, and was acting under the direction and control of the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE, in such capacity as an agent, servant and employee of the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE. Upon information and belief, and at all times material hereto, Defendant BENDER participated in the constitutional violations and other wrongful acts that occurred on October 10, 2010, at which time he was acting within the course and scope of his employment under color of state law. Defendant BENDER is and was a citizen of the State of Florida and is otherwise sui juris.

9.      At all times material hereto Defendant, PALM BEACH COUNTY SHERIFF'S OFFICE, [Ric L. Bradshaw, in his capacity as Sheriff of Palm Beach County, Florida] is an entity, corporate and political, duly organized under the laws of the State of Florida. PBSO is the governmental entity responsible as a matter of law, for the actions of its officials, agents and employees and was responsible for their training, supervision and conduct. PBSO is also responsible for ensuring that police personnel of PBSO obey the laws of the State of Florida and ensuring that the rules and regulations of PBSO are followed and enforced.

10.     Plaintiff sues Defendant FRANQUI in his Individual Capacity.

11.     Plaintiff sues Defendant STACHELEK in is Individual Capacity.

12.     Plaintiff sues Defendant BENDER in his Individual Capacity.

**FACTS COMMON TO ALL COUNTS**

13.     At the time of the filing of this complaint and at the time of the incident that occurred

on October 10, 2010, JEREMY is severely mentally disabled, suffers from Down Syndrome,  and

has been declared incompetent by a panel of mental health professionals.

*Events which Occurred on the Night of October 10, 2010*

14.     On the evening of October 10, 2010, Mrs. Amy Hutton, mother of JEREMY called

Palm Beach County Sheriff's Office, Communications Division, (hereinafter "9-1-1") because

JEREMY, who was 17 years of age at the time and has Down Syndrome, was believed to have

driven off in the family mini-van.

15.     During her conversation with the 9-1-1dispatcher, Mrs. Hutton expressed that she

was fearful that JEREMY may be danger and advised the 9-1-1 dispatcher numerous times that

JEREMY is 17 years of age and is "mentally handicapped" and has "Down Syndrome."  She further

advised that JEREMY does not have a driver's license and has never driven a car before.

16.     Shortly after Mrs. Hutton called 9-1-1, a marked PBSO pick-up truck driven

by Deputy Sheriff STACHELEK observed JEREMY driving the mini-van in an erratic manner with

a flat tire in the southbound lanes of Royal Palm Beach Boulevard toward Okeechobee Boulevard

at an extremely slow speed.  Deputy Sheriff STACHELEK followed behind JEREMY in an attempt

to effectuate a traffic stop by utilizing his lights and sirens but due to JEREMY's mental handicap,

JEREMY did not appreciate or understand what was going on.

17.     As the vehicles continued to travel southbound on Royal Palm Beach Boulevard

at a very slow speed, a second deputy, Deputy Sheriff FRANQUI, who was driving a marked PBSO

patrol car assumed the lead role in following the vehicle. Deputy Sheriff FRANQUI's vehicle was equipped with a dashboard video camera.

18.      Deputy Sheriff FRANQUI and/or Deputy Sheriff STACHELEK can be heard on the police radio discussing with the dispatcher that JEREMY was "mentally handicapped" and has "Down Syndrome." Deputy STACHELEK is with PBSO District 15 while Deputy Sheriff FRANQUI is assigned to District 9. When STACHELEK asks the dispatcher if District 9 had been notified, the dispatcher responded that BOLO had already gone out to District 9. Additionally, the deputies are heard confirming with dispatch that JEREMY does not possess a driver's license and does not know how to drive.

19.      PBSO Deputies, FRANQUI and STACHELEK knew that they were dealing with a mentally handicapped minor behind the wheel of a vehicle, who was unresponsive to police lights and sirens, FRANQUI and STACHELEK should have and could have taken steps to stop the vehicle JEREMY was operating during a long stretch on Royal Palm Beach Boulevard which was devoid of any traffic. It must be noted that at no time during the course of following the van did either deputy utilize his PA microphone and attempt to speak directly to JEREMY. Additionally and at the very least, Defendant FRANQUI and Defendant STACHELEK should have stopped the flow of traffic as they were approaching the busy intersection of Royal Palm Beach Boulevard and Okeechobee Boulevard. Incidentally, a supervisor is heard on the PBSO radio to say he was already at the intersection.

20.      JEREMY arrived at the intersection of Royal Palm Beach Boulevard and Okeechobee Boulevard and brought the van to a complete stop. At that time FRANQUI carelessly and recklessly positioned his patrol car partially in front of the van JEREMY was operating, with

the opened driver's side door being approximately 1-2 feet from the passenger side front bumper of the van.

21.     Immediately after pulling in front of JEREMY's vehicle, FRANQUI exited his patrol car, with his hand on his weapon, and in direct contravention to PBSO General Order 500.00, placed himself in a position of danger between the van being driven by JEREMY, a mentally handicapped teenager, and his patrol car.  At no time during this entire chain of events did  FRANQUI ever attempt to give any verbal commands.

22.     FRANQUI jumping out of his vehicle startled JEREMY causing him to sharply turn to the left away from the Deputy FRANQUI and the patrol car as he moved forward.  As he did so, the passenger side of the van inadvertently made contact with the driver's door of the patrol car which was left fully opened after FRANQUI had exited and moved to the rear door of the patrol car.

23.     As evidenced on FRANQUI's dashboard camera video, FRANQUI with a depraved indifference to human life and conscious disregard for the safety of the general public, discharged his firearm six (6) times at the van *after* the van inadvertently struck the open door and had already cleared the front bumper of the patrol car.

24.     As evidenced by the Traffic Control Camera and dashboard camera video, it is clear that all of the shots were fired once the van was moving away from FRANQUI and had entered the westbound lanes of Okeechobee Boulevard.  It should be noted that the shots shattered the two (2) rear passenger side windows and the rear window of the van with two (2) shots hitting a passing vehicle.

25.     After being shot three (3) times from behind, a seriously injured and dazed JEREMY lost control of the van. The van veered through the busy intersection and came to rest in the

westbound turning lanes of Okeechobee Boulevard colliding into two (2) vehicles.

26.     Once the van came to final rest, FRANQUI is seen on the dashboard camera video, running across the intersection with his gun drawn in the direction of the van.   Also seen on the dashboard camera video is Deputy Sheriff STACHELEK pulling his vehicle along side the mini-van and an Off-Duty Deputy Sheriff later identified as BENDER, is seen running across the intersection in an attempt to aide deputies FRANQUI and STACHELEK.

27.     Once Deputy FRANQUI arrived at the van, he opened the driver's side door of the mini-van and ordered a shot, seriously wounded, scared, and mentally handicapped JEREMY out of the vehicle.

28.     As JEREMY stumbled out of his vehicle, he was initially grabbed by Deputy BENDER and then Deputy FRANQUI grabbed his shoulder and performed a leg sweep type maneuver causing JEREMY, who had been shot from behind three (3) times by Deputy FRANQUI to violently fall to the ground.

29.     While JEREMY who was fully restrained in handcuffs and was profusely bleeding from his head, hand, and shoulder was lying face down on the ground, he lifted his head out of fear, pain and not being able to understand nor comprehend the events that have just occurred.  At this point, BENDER aggressively and forcibly slammed JEREMY's face and head down into the pavement and held JEREMY down for over six (6) minutes. At no time did any of the deputies render first aid to JEREMY who had been seriously wounded in his head, hand and shoulder after being shot three (3) times by FRANQUI.

30.     Approximately six (6) minutes after JEREMY is incapacitated and restrained Palm Beach County Fire Rescue responded to the scene where they transported JEREMY to St. Mary's

Medical Center for Emergency Medical Treatment to include multiple surgical procedures. Despite the gravity and critical state of JEREMY's condition and his mental handicap/disability, PBSO Deputies required that JEREMY remain handcuffed and restrained throughout his transportation with Fire Rescue and for the majority of his lengthy hospital stay.

31.     In an effort to cover up their illegal use of force, unlawful detention, unlawful arrest, improper handling of the incidents involving a mentally ill/handicapped person and overall gross negligence which resulted in the improper use of excessive force, Defendant FRANQUI, Defendant STACHELEK, and Defendant BENDER, with the possible aid of other Deputies from Defendant PBSO, fabricated an elaborate story about Plaintiff trying to run over Defendant FRANQUI and Defendant FRANQUI being in fear for his life despite the fact that the video clearly disputes such a fabrication.

32.     In an effort to support this fabricated story, Defendant FRANQUI, Defendant STACHELEK, Defendant BENDER, and Defendant PBSO, sought to charge JEREMY with one count of Attempted Felony Murder pursuant to Fla. Stat. §782.051 and one count of Assault and Battery of a Law Enforcement Officer pursuant to Fla. Stat. §784.07.

33.     The police reports prepared by Defendant FRANQUI, Defendant STACHELEK, Defendant BENDER, and other Deputies of Defendant PBSO, for submission to prosecuting authorities contained false statements and/or material omissions, and included a fabricated chain of events that was the result of collusion between the Deputies involved.

34.     The conduct of Defendant FRANQUI, Defendant STACHELEK, and Defendant BENDER occurred under the color of State Law.

35.     Due to the numerous officers who participated in violence against the Plaintiff,

the lack of fear among those officers that any of their colleagues would find their actions improper and report them for improper conduct, and the lack of discipline or consequences towards those who wantonly violated Plaintiff's rights, it is clear that Defendant FRANQUI's, Defendant STACHELEK's, Defendant BENDER's, actions reflect a custom, policy, and practice of Defendant PBSO.

36.     Taking Plaintiff's allegations as true, since none of the other officers reported anything improper or unusual to their superiors, it is clear that all the officers on the scene consider violation of rights and inflicting violence upon mentally ill/handicapped persons they arrest to be standard procedure and consistent with the policy, custom, practice, and training of Defendant PBSO.

37.     Defendant PBSO's Internal Affairs investigation into the incident found no wrong-doing and thus condoned all actions taken by their officers upon Plaintiff.

38.     Plaintiff's civil rights were violated with the use of excessive force by Defendant FRANQUI, Defendant STACHELEK, Defendant BENDER and Defendant PBSO when Plaintiff was forcibly shot at six (6) times from behind, struck by three (3) bullets, was forcibly tripped to the ground using a leg sweep maneuver and was forcibly slammed and pinned down to the ground as he tried to lift his head while he was already in handcuffs.

39.     Plaintiff's civil rights were additionally violated as a result of an unconstitutional arrest and illegal seizure by Defendant FRANQUI, Defendant STACHELEK, Defendant BENDER and Defendant PBSO as there was no probable cause to arrest JEREMY for the alleged charges of Attempted Felony Murder and Assault and Battery of a Law Enforcement Officer because JEREMY was incapable of having the requisite intent required to commit these crimes as a result of his mental

handicap/disability and incompetence.

40.     Defendant PBSO knew or should have known the dangerous propensities of Defendants FRANQUI, STACHELEK and BENDER, to engage in unlawful conduct, including the use of excessive force and conducting unlawful arrests, in their employ as officers for the Defendant PBSO, based upon their unlawful conduct.

### *Common Practice for PBSO*

41.     On a daily basis, Deputy Sheriff's come into contact with mentally ill/handicapped individuals during their patrolling duties. Despite this daily contact, Defendant PBSO made no effort to adequately train and supervise said deputies.  In order to adequately deal with the certainty of police contact with the mentally ill/handicapped, PBSO is charged with supplying the public with a police force that is adequately trained and equipped to handle calls dealing with the mentally ill/handicapped.

42.     PBSO was aware that there needed to be effective supervisory and command structure in place to deal with the problem of responding to incidents with the mentally ill/handicapped. PBSO failed to provide adequate supervision of its deputies in the field when said deputies encounter the mentally ill/handicapped.

43.     At all times material hereto, Defendant PBSO was responsible for adopting and implementing the rules and regulations with or in regard to hiring, screening, training, supervising, controlling, disciplining, and assigning deputies to their duties with in Palm Beach County, Florida.

44.     Defendant PBSO has maintained a custom of excessive force in executing arrests by its sworn law enforcement officers. At all times material hereto, under Defendant PBSO General Order 500.01 for Use of Non-Deadly/Less Lethal Force, Employees may use only the amount of

force reasonably necessary to affect lawful objectives and can only escalate to the next level of force that is justified considering the amount of resistence given and the potential of injury of the subject by  using that type of control.

45.    Defendant PBSO's action in this case and previous similar situations indicate a policy and custom of indifference to the rights of those mentally ill/handicapped persons they arrest and a failure to train properly and/or supervise, their officers in how to deal with mentally ill/handicapped persons being arrested. PBSO's refusal to adequately train its Deputies in how to interact with mentally ill/handicapped persons and its failure to supervise those deputies has resulted in the infliction of violence upon mentally ill/handicapped persons and the violation of their constitutional rights. This lack of training and supervision causes these ill-trained and ill-equipped deputies to resort to the use of excessive force as their only alternative.

46.    PBSO Deputies have increasingly and alarmingly, used deadly and excessive force in situations where the use of such force was entirely unjustified and where the conduct of the officers created dangers that would otherwise have not existed and contributed to the claimed need to use force. There has specifically been an increasing and alarming number of similar incidents of "officer involved shootings" in which PBSO Deputies have shot members of the public, falsely arrested members of the public, and/or seriously injured or endangered the public by the intentional and/or negligent misconduct by Deputies of the Palm Beach County Sheriff's Office. Said serious incompetence or misbehavior has been general or widespread throughout the department.

47.    Further, there has been a pattern of similar incidents in which citizens with a mental illness/handicap have been injured or endangered by the intentional and/or negligent misconduct of Deputies of the Palm Beach County Sheriff's Office and/or that serious incompetence or misbehavior was general or widespread throughout the department.

48.     Examples of the above referenced pattern of similar incidents which occurred prior to the incident alleged in this Complaint are as follows:

a.      On or about March 9, 2005, in Boca Raton, Florida, PBSO Deputies opened fire on a severely depressed and suicidal thirty-seven year old man with a gun to his head, after a PBSO Deputy's stumble startled other officers. PBSO took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons. The PBSO Deputies involved admitted that they had received little to no training in the handling of suicidal subjects and were not aware of PBSO having any crisis intervention team or department to handle suicidal persons.

b.      On or about April 6, 2007, in Boynton Beach, Florida, PBSO Deputies utilized excessive force against a bipolar and severely medicated individual whose father reported had locked himself in his room with a gun and was threatening to kill himself. Without calling out or identifying themselves, the PBSO Deputies ran into the room and fired two rounds into the individual despite no acts of provocation by the individual. The Deputies then tasered the individual as he lay bleeding on the floor. PBSO took no disciplinary action against these Deputies who inflicted this excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons.

c.      On or about March 23, 2008, in Lake Worth, Florida, a PBSO Deputy unnecessarily utilized his taser on a handcuffed and compliant man, following a routine traffic stop. PBSO took no disciplinary action against this Deputy who excessively deployed his Taser, and failed

to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

d.      On or about July 15, 2008, in West Palm Beach, Florida, a PBSO Deputy utilized his taser excessively during an arrest of an individual. PBSO took no disciplinary action against this Deputy who inflicted this excessive tasing, and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

e.      On or about August 6, 2008, in Royal Palm Beach, Florida, PBSO deputies followed a car into a movie theater parking lot at night. After the car appeared to accidentally bump into the police vehicle, causing no damage, a PBSO Deputy shot and killed the sixteen year-old unarmed driver. The PBSO Deputy later claimed to be fearful that the boy was trying to run him over. PBSO took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

f.      On or about December 1, 2008, in West Palm Beach, Florida, PBSO Deputies used excessive force when they shot and killed a suspect whose mother had called to report that her son, who was mentally unstable and addicted to drugs, had taken her vehicle. Despite the fact that the individual had no history of violence and was unarmed, a team of PBSO Deputies surrounded the vehicle and unjustifiably used excessive force, including deadly force, when they shot and killed the suspect because he refused to exit the vehicle. PBSO took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons.

49.     Between January 1, 2005 and the date of the incident described in this Complaint, PBSO Deputies shot thirty-one people while in the line of duty, killing sixteen of them. Of these thirty-one (31) shootings, thirty (30) were found by PBSO to be justified, often following little or no investigation.

50.     A number of these shootings between 2005 and 2010 led to lawsuits, resulting in the payment of awards or settlements by PBSO which served to put PBSO on notice of the need for better policies, procedures, customs, and practices and the numerous deficiencies in PBSO's approach to the use of force, particularly in officer involved shootings and encounters with mentally ill/handicapped persons.

51.     Nonetheless, the pattern of abuse continued. In 2012, 2013, and the first four months of 2014, PBSO deputies were involved in twenty shootings, thirteen of them fatal, many of them involving encounters with mentally ill/handicapped persons. Among those were:

    a.      On or about October 4, 2012, in Boynton Beach, Florida, PBSO Deputies shot and killed an 18-year-old autistic and bipolar boy who had been involved in a domestic incident with his mother. The PBSO Deputy shot eleven rounds at the unarmed autistic boy as he reached into his pants to grab lava rocks. PBSO took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons. Additionally, Sheriff Bradshaw issued a statement supporting the Deputy stating "The deputy took the action he had to take."

    b.      On or about April 4, 2014, in Boca Raton, Florida, PBSO Deputies encountered an individual suffering from mental health issues who had run out of his medication.

The responding Deputy encountered the individual standing beside a vehicle and ordered him to remove his hands from his pockets. When the individual removed a screwdriver from his pocket, the PBSO Deputy fired his weapon killing the individual. PBSO took no disciplinary action against these Deputies who inflicted this deadly and excessive force, and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during encounters with mentally ill/handicapped persons.

52.     The trend of increased use of force shows no sign of letting up. PBSO is on notice of this trend but has not acted to stop it. PBSO has created a Post-Critical Incident Assessment Team to meet, discuss, and evaluate shootings, but the team is directed to produce no formal reports and draw no official conclusions. Instead, a collection of notes and informal observations are forwarded to PBSO's attorneys in anticipation of litigation. It is thus, by design, incapable of determining whether an officer involved in a shooting is in need of training, discipline, or other remedial action. Moreover, PBSO's training division does not conduct formal reviews of officer involved shootings.

53.     PBSO, through Sheriff Bradshaw or other spokesmen, routinely makes public statements, shortly after an officer involved shooting or other use of force, justifying and/or defending the Deputy's actions. These statements send the message to PBSO Deputies that the use of deadly and excessive force is condoned without any serious review of or regard for justification and will not result in any adverse consequences. This message is strongly reinforced when PBSO declares a shooting or excessive use of force "justified" with little or no investigation, formally ratifying the Deputies' conduct.

54.     Defendant PBSO has maintained a long-standing, widespread history of failure to train, supervise or otherwise discipline its police officers for among other things, the use of

excessive force, unlawful detentions, unlawful arrests and the improper treatment of mentally ill/handicapped persons even though it had notice of this unlawful conduct by its employees and the public.

55.     The Defendant PBSO has maintained a system of review of complaints and incidents involving abuses of lawful authority such as the illegal use of force, unlawful detention, unlawful arrests, and the improper handling of incidents involving mentally ill/handicapped persons, by sworn law enforcement officers which has failed to identify improper use of force by police officers. As a result of PBSO's failure to subject police officers who employed such acts to appropriate discipline, closer supervision and/or retaining, it has become the de facto policy and custom of Defendant PBSO to tolerate such acts by its officers.

56.     Indeed, PBSO routinely performs cursory investigations of incidents involving extremely questionable use of deadly and excessive force on the part of PBSO Deputies, with an eye toward exonerating the Deputy involved rather than finding out the truth. Almost uniformly, investigating officers and supervisors uncritically endorse the Deputies' versions of events, even when those versions are incomplete, inconsistent, or are in direct contradiction of objective evidence. The result is that these incidents involving questionable use of force are not properly and impartially investigated, documented, or addressed with corrective measures where warranted.

57.     Due to this intentionally inadequate investigative process, in virtually all officer involved shootings and excessive force incidents, PBSO has declared the conduct of its Deputies to be justified, particularly in those involving mentally ill/handicapped individuals.

58.     The foregoing acts, omissions, policies or customs of the Defendant PBSO, caused law enforcement officers, including Defendants FRANQUI, STACHELEK and BENDER, to believe

that acts such as the improper use of force, unlawful detentions, unlawful arrests and the improper handling of incidents involving mentally ill/handicapped persons, would not be properly investigated. The consistent lack of accountability within PBSO for the questionable and often unjustifiable use of deadly and/or excessive force has promoted an acceptance of disproportionate, aggressive, and unconstitutional behavior towards ordinary citizens. The resulting culture of aggression both promotes and condones intimidating and harsh approaches toward the citizenry, with the excessive use of force as a frequent and foreseeable outcome.

59. Despite the notice and knowledge of Defendant PBSO as to the dangerous propensities of their sworn law enforcement officers because of said officers' lack of training, skill and/or experience, said Defendant failed to implement any policies or programs to train said officers or otherwise intentionally failed to protect the public, including the Plaintiff from its danger.

60. Defendant PBSO had policies, customs, and practices that constituted deliberate indifference to Plaintiff's Constitutional Rights and Defendant PBSO's policy and custom which caused the violation of Plaintiff's rights and/or was the moving force behind such Constitutional violations as indicated by the facts and evidence described above.

61. PBSO's deliberate indifference towards JEREMY and other mentally ill/handicapped persons led to JEREMY being forcibly shot at six (6) times as he drove away from Deputy FRANQUI, struck in the head, hand and shoulder by three (3) bullets, forcibly tripped to the ground using a leg sweep maneuver, forcibly taken to the ground and forcibly slammed and pinned down as he tried to lift his head after he had already been handcuffed.

62. The policies, customs, and practices complained of include, but are not limited to, the following:

a.      Deliberate indifference by failing to institute an appropriate policy for the pursuit of suspects and by failing to enforce such a policy, if such a policy was in place;

b.      Deliberate indifference by failing to ensure that PBSO employees were sufficiently trained or otherwise educated in the extension and management or traffic pursuits from the perspective of the pursuing officer(s), dispatch officers and supervising or managing officers;

c.      Deliberate indifference by failing to provide sufficient supervision of the pursuit in question; and by failing to monitor the pursuit in question;

d.      Deliberate indifference by improperly training PBSO Deputies in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict harm upon persons being arrested;

e.      Deliberate indifference by improperly training PBSO Deputies in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict harm upon mentally ill/handicapped persons they encounter;

f.      Deliberate indifference in failing to properly supervise PBSO Deputies in their encounters with persons they arrest;

g.      Deliberate indifference in failing to have Deputies properly reviewed for accurate use of force of incidents involving force used against arrested persons and mentally ill/handicapped persons, with conclusions frequently permitted to be drawn on the basis of clearly incorrect or contradictory information.

h.      Deliberate indifference in failing to determine whether said employees, including Defendants FRANQUI, STACHELEK and BENDER, posed a threat to the public as a result of their propensity to commit unlawful acts.

63. The Defendant PBSO was grossly and willfully negligent in the selection and/or training and/or supervision and/or retention of Defendant FRANQUI, Defendant STACHELEK, Defendant BENDER, as sworn law enforcement officers of the Defendant PBSO, in that:

a. It appointed said Defendants as sworn law enforcement officers when it knew or in the exercise of reasonable care should have known, of the disposition of Defendants FRANQUI, STACHELEK and BENDER, to engage in such unlawful conduct.

b. Despite the fact that it knew or should have known that this pattern of conduct was being carried out by its agents and employees, Defendant PALM BEACH COUNTY SHERIFF'S OFFICE, has failed to and refused to:

(1) Remove Defendants FRANQUI, STACHELEK and BENDER, from their positions as sworn law enforcement officers.

(2) Take any disciplinary action against said sworn law enforcement officers.

(3) Provide redress for citizens, such as the Plaintiff, who have been injured thereby.

64. Defendant PBSO's deliberate indifference, failure to train, failure to effectively supervise, and permission and toleration of, the patterns and practices enumerated above, were the moving forces causing the serious injuries to Plaintiff and the violation of Plaintiff's Constitutional Rights.

65. The actions of Defendant FRANQUI, Defendant STACHELEK, Defendant BENDER, in this case as well as the actions of Defendant PBSO in other similar situations indicate that the individuals who violated Plaintiff's rights in this case acted in accordance with Defendant PBSO's policies and reflect policies that were adopted by Defendant PBSO and their high ranking officials.

66.    The failure of PBSO to competently investigate use of force incidents and encounters

with mentally ill/handicapped persons, and to institute appropriate disciplinary and retraining action

in the wake of them, serves to tacitly condone the egregrious misconduct of the Deputies involved.

The agency's inaction in this regard effectively annuls its official general orders regarding the use

of force and substitutes in their place a permissive de facto policy and custom of tolerating excessive

force, which will invariable have the effect of promoting similar misconduct by other deputies in the

future. In sum, the pattern and practice of the excessive use of force on the part  of PBSO Deputies

stems from systemic deficiencies in training and supervision and from the inadequate investigation

and routine ratification of deadly and excessive force.

### COUNT I
### 42 U.S.C. §1983 - EXCESSIVE USE OF FORCE BY DEFENDANT FRANQUI,

67.    Plaintiff realleges the allegations contained in paragraphs 1-66 as if fully set forth

hereinagain at length.

68.    At all times relevant and material hereto and at the time of the incident which

occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from

Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

69.    Defendant FRANQUI used excessive force against JEREMY when with a depraved

indifference to human life and conscious disregard for the safety of the general public, he discharged

his firearm 6 (six) times at a vehicle moving away from him in which three (3) bullets struck

JEREMY, and forcibly tripped JEREMY to the ground using a leg sweep maneuver which caused

JEREMY to violently fall to the ground.

70.    At no time was JEREMY under suspicion of committing a serious crime.  At no time

did JEREMY possess a weapon or pose an immediate threat to Defendants FRANQUI, STACHELEK and BENDER. As a result of the BOLO that went out to both District 9 and District 15, all deputies knew or should have known JEREMY suffered from Down Syndrome and was severely mentally handicapped.

71.    No reasonable officer confronted with the facts and circumstances confronting FRANQUI would have believed that the force used on JEREMY on October 10, 2010 was objectively reasonable and not in violation of JEREMY's clearly established rights under the Fourth Amendment.

72.    As a result of the outrageous conduct of Defendant FRANQUI, Plaintiff required immediate medical care.

73.    As a further direct and proximate result of the conduct of Defendant FRANQUI, Plaintiff suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment. These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.    Judgment for compensatory damages;

b.    Judgment for exemplary or punitive damages;

c.    Cost of suit;

d.    Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

e.    Trial by jury as to all issues so triable; and

f.    Such other relief as this Honorable Court may deem just and appropriate.

<u>COUNT II</u>
**42 U.S.C. §1983 Claim Against DEFENDANT STACHELEK for Failure to Intervene**

74.     Plaintiff realleges the allegations contained in paragraphs 1-66 as if fully set forth hereinagain at length.

75.     At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

76.     STACHELEK was present when FRANQUI and BENDER used excessive force when Plaintiff was forcibly shot at six (6) times as the van moved away from FRANQUI, was struck by three (3) bullets, was forcibly tripped to the ground using a leg sweep maneuver, was forcibly taken to the ground and was forcibly slammed and pinned down as he tried to lift his head after he had already been handcuffed.

77.     STACHELEK stood by and watched the events unravel and failed to intervene or otherwise attempt to diffuse the situation.  STACHELEK failed to take necessary steps to protect JEREMY from FRANQUI and BENDER's unconstitutional use of excessive force although he was in a position to do so.

78.     STACHELEK had ample time and ability to intervene and prevent the use of excessive force against JEREMY.

79.     A police officer's duty to intervene when the officer witnesses the use of unconstitutional excessive force with the time and ability to intervene was clearly established on October 10, 2010.

80.     At no time was JEREMY under suspicion of committing a serious crime.  At no time

did JEREMY possess a weapon or pose an immediate threat to Defendants FRANQUI, STACHELEK and BENDER. As a result of the BOLO that went out to both District 9 and District 15, all deputies knew or should have known JEREMY suffered from Down Syndrome and was severely mentally handicapped.

81.     No reasonable officer confronted with the facts and circumstances confronting STACHELEK would have believed his failure to intervene was objectively reasonable.

82.     As a further direct and proximate result of the conduct of Defendant STACHELEK, Plaintiff suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment. These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.     Judgment for compensatory damages;

b.     Judgment for exemplary or punitive damages;

c.     Cost of suit;

d.     Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

e.     Trial by jury as to all issues so triable; and

f.     Such other relief as this Honorable Court may deem just and appropriate.

## COUNT III
## 42 U.S.C. §1983 - EXCESSIVE USE OF FORCE AGAINST DEFENDANT BENDER

83.     Plaintiff realleges the allegations contained in paragraphs 1-66 as if fully set forth hereinagain at length.

84.     At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

85.     At the time of the encounter between JEREMY and BENDER, JEREMY who has Down Syndrome, had already been shot three (3) times was bleeding profusely from his head, hand and shoulder, was unarmed, posed no threat of serious injury or bodily harm to the deputies on the scene.  After JEREMY was forcibly thrown to the ground by Defendant FRANQUI, placed in handcuffs, and was fully under control of Defendant FRANQUI, Defendant STACHELEK and Defendant BENDER, Defendant BENDER forcibly slammed JEREMY's face into the ground and held his face down on the ground. Defendant BENDER continued to pin JEREMY on the ground for at least six (6) minutes without providing any medical attention to JEREMY who continued to bleed profusely from his head, hand, and shoulder. The force that was used by Defendant BENDER when he forcibly slammed JEREMY's head and handcuffed body to the ground after being shot three (3) times and held him to the ground refusing to provide or allow for medical attention was disproportionate to the force reasonably necessary.

86.     At no time was JEREMY under suspicion of committing a serious crime.  At no time did JEREMY possess a weapon or pose an immediate threat to Defendants FRANQUI, STACHELEK and BENDER. As a result of the BOLO that went out to both District 9 and District 15, all deputies knew or should have known JEREMY suffered from Down Syndrome and was severely mentally handicapped.

87.     No reasonable officer confronted with the facts and circumstances confronting BENDER would have believed that the force used on JEREMY on October 10, 2010 was objectively

reasonable and not in violation of JEREMY's clearly established rights under the Fourth Amendment.

88.     As a result of the outrageous conduct of Defendant BENDER, Plaintiff required immediate medical care.

89.     As a further direct and proximate result of the conduct of Defendant BENDER, Plaintiff suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment. These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.     Judgment for compensatory damages;

b.     Judgment for exemplary or punitive damages;

c.     Cost of suit;

d.     Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

e.     Trial by jury as to all issues so triable; and

f.     Such other relief as this Honorable Court may deem just and appropriate.

**COUNT IV**
**42 U.S.C. §1983 CLAIM AGAINST**
**DEFENDANT PALM BEACH COUNTY SHERIFF'S OFFICE - Deliberate Indifference**

90.     Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

91.     At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from

Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

92.     Defendants, FRANQUI, STACHELEK, and BENDER, while acting under color of law, deprived JEREMY of rights and privileges secured to him by the Constitution and laws of the United States, in violation of 42 U.S.C. §1983.

93.     The actions and omissions of FRANQUI, STACHELEK, and BENDER, resulted in JEREMY being forcibly shot 6 (six) times with a depraved indifference to human life and conscious disregard for the safety of the general public, struck by three (3) bullets, forcibly tripped to the ground using a leg sweep maneuver, and forcibly slammed and pinned down to the ground as he tried to lift his head after he had already been handcuffed.

94.     PBSO also violated JEREMY's Fourth Amendment rights by failing to train its deputies to reasonably respond to individuals who are mentally ill/handicapped and by engaging in policies and practices that caused constitutional violations to the mentally ill community by inappropriately responding to mental health emergencies with excessive force.

95.     These constitutional deprivations were caused by PBSO's lack of training and supervision in regards to deputies having the ability and knowledge to appropriately interact with the mentally ill without causing death or physical injury.

96.     Defendants, FRANQUI, STACHELEK, and BENDER knew or should have known that JEREMY was severely mentally handicapped and suffered from Down Syndrome and should have known that any use of force was objectively unreasonable in light of the totality of the circumstances.

97.     The force used by Defendants FRANQUI and BENDER against Plaintiff during the course of Plaintiff's unlawful arrest was objectively inhuman and unnecessary, and constituted the

unreasonable and excessive use of force, in violation of the Plaintiff's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. §1983.

98.    At no time was JEREMY under suspicion of committing a serious crime. At no time did JEREMY possess a weapon or pose an immediate threat to Defendants FRANQUI, STACHELEK and BENDER. As a result of the BOLO that went out to both District 9 and District 15, all deputies knew or should have known JEREMY suffered from Down Syndrome and was severely mentally handicapped.

99.    As a result of the outrageous conduct of Defendant PBSO, Plaintiff required immediate medical care.

100.    As a further direct and proximate result of the Defendant PBSO's Deputies and the policies and practices of Defendant PBSO, Plaintiff suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment. These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.    Judgment for compensatory damages;

b.    Judgment for exemplary or punitive damages;

c.    Cost of suit;

d.    Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

e.    Trial by jury as to all issues so triable; and

f.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT V
## 42 U.S.C. §1983 CLAIM AGAINST
**DEFENDANT PBSO** [Ric L. Bradshaw, in his capacity as Sheriff of Palm Beach County, Florida] **for  Supervisory Liability**

101.     Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

102.     At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

103.     Defendant PBSO violated JEREMY's Fourteenth Amendment substantive due process and Fourth Amendment right by failing to adequately train deputies to respond to calls involving mentally ill/handicapped individuals.

104.     Defendant PBSO's chief policy maker, Sheriff Bradshaw, is responsible for the implementation and promulgation of official policies for PBSO.  Further, Sheriff Bradshaw is responsible for the promulgation of policies and the implementation of training to maintain an effective police force that is capable and prepared to deal with encounters with the mentally ill/handicapped.

105.     Defendant PBSO was deliberately indifferent to his responsibility to adequately prepare his deputies for encounters with the mentally ill/handicapped and for their interaction, with, detention and arrest of the same.

106.     Defendant PBSO knew or should have known, due to the large numbers of mentally ill/handicapped individuals in Palm Beach County that his deputies would routinely encounter mentally ill/handicapped individuals and that these officers would need to be aware of the

appropriate methods for the detention and/or arrest of a mentally ill/handicapped individual.

107.    Defendant PBSO is charged with properly equipping officers with the available and necessary non-deadly force technologies that would simultaneously allow deputies to maintain their own safety and subdue mentally ill/handicapped individuals without causing their serious injury.

108.    Defendant PBSO was deliberately indifferent to their responsibility to create an effectively trained police force that could adequately respond to the scene of encounters with the mentally ill/handicapped to prevent serious bodily harm.  All of the conduct at the scene to subdue JEREMY was contrary to established police methods for subduing the mentally ill/handicapped individuals.

109.    Thus, there were no sufficiently trained deputies available to reasonably and effectively deal with the unlawful arrest or detention of JEREMY at the scene. All of the acts and omissions of the insufficiently trained deputies were inappropriate to the situation and caused the encounter to be escalated.  Further, the officers were not provided with equipment to subdue JEREMY other than by the use of excessive force.  Nor were there sufficiently detailed policies and procedures in place for the responding deputies to have adequate direction or assistance in responding to the incident that occurred on October 10, 2010.

110.    All of the above referenced failures are the responsibility of Defendant PBSO who was deliberately indifferent to their responsibility to have appropriate policies and procedures in place, and to train, supervise and properly equip deputies employed by PBSO to deal with the recurring situation of responding calls involving the mentally ill/handicapped.

111.    As a direct and proximate result of-the-conduct described above, Plaintiff suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment.  These losses are either permanent or continuing and Plaintiff

will suffer the losses in the future, in violation of Plaintiff's civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.      Judgment for compensatory damages;

b.      Judgment for exemplary or punitive damages;

c.      Cost of suit;

d.      Reasonable attorney's fees;

e.      Trial by jury as to all issues so triable; and

f.      Such other relief as this Honorable Court may deem just and appropriate.

**COUNT VI**
**NEGLIGENT RETENTION AGAINST**
**PALM BEACH COUNTY SHERIFF'S OFFICE AS TO ALL DEFENDANTS**

112.    Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

113.    At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

114.    Prior to this incident, Defendant PBSO failed to properly screen and train Defendant FRANQUI, Defendant STACHELEK, and Defendant BENDER.

115.    Defendant PBSO negligently retained as a Certified Sworn Law Enforcement Officer, JASON FRANQUI, for his illegal and unlawful actions after this incident.

116.    Defendant PBSO negligently retained as a Certified Sworn Law Enforcement Officer, JOSEPH STACHELEK, for his illegal and unlawful actions after this incident.

117.    Defendant PBSO negligently retained as a Certified Sworn Law Enforcement Officer, KEITH BENDER, for his illegal and unlawful actions after this incident.

118.    Defendant, PBSO was on notice at the time of this incident of Defendant, JASON FRANQUI's, personnel jacket and history of internal affairs complaints.

119.    Defendant, PBSO was on notice at the time of this incident of Defendant, JOSEPH STACHELEK's, personnel jacket and history of internal affairs complaints.

120.    Defendant, PBSO was on notice at the time of this incident of Defendant, KEITH BENDER's, personnel jacket and history of internal affairs complaints.

121.    As a direct and proximate result of-the-conduct described above, Plaintiff suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment.  These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.    Judgment for compensatory damages;

b.    Judgment for exemplary or punitive damages;

c.    Cost of suit;

d.    Reasonable attorney's fees;

e.    Trial by jury as to all issues so triable; and

f.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT VII
## NEGLIGENT USE OF A FIREARM
## PALM BEACH COUNTY SHERIFF'S OFFICE

122.     Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

123.     Defendant FRANQUI's conduct of carelessly and recklessly pulling in front of JEREMY's vehicle and immediately exiting his patrol car created a foreseeable zone of risk. Defendant FRANQUI owed a duty to all within the zone, including JEREMY, to act with reasonable care to lessen the risk or see that sufficient precautions were taken to protect others from the harm that the risk imposes.

124.     Defendant FRANQUI breached his duty of care to JEREMY by virtue of Defendant FRANQUI's negligent handling of a firearm and his negligent decision to use a firearm as to JEREMY.

125.     Pursuant to Florida Statute 768.28(9), Defendant PBSO is vicariously liable, but Defendant FRANQUI is not personally liable, for Defendant FRANQUI's negligence.

126.     As a direct and proximate result of Defendant FRANQUI's negligence, Plaintiff suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment. These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.     Judgment for compensatory damages;

b.     Judgment for exemplary or punitive damages;

c.     Cost of suit;

d.     Reasonable attorney's fees;

e.     Trial by jury as to all issues so triable; and

f.     Such other relief as this Honorable Court may deem just and appropriate.

<u>COUNT VIII</u>
**ADA TITLE II  - PALM BEACH COUNTY SHERIFF'S OFFICE**

127.    Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

128.    At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

129.    Pursuant to Title II of the ADA each state and local government and each agency of such a government is obligated to evaluate its current services, policies, and practices, and their effects, that do not or may not meet the requirements of Title II of the ADA, and if modification of services, policies, and practices is needed to achieve compliance, make the necessary modifications.

130.    To assure compliance with the ADA, local and state governments should conduct training of their employees. In that way, each state and locality and each instrumentality of such a state or locality can assure that individuals with disabilities are provided services in a manner that complies with the ADA.

131.    On information and belief, Palm Beach County Sheriff's Office did not have any training for its deputies in how to interact with developmentally disabled/mentally handicapped individuals.

132.    On information and belief Palm Beach County Sheriff's Office did not have any policy, procedure, manual, general order, or other guidance for their deputies in how to interact with and provide services to individuals with developmental disabilities/ mental handicaps.

133.    Defendant Palm Beach County Sheriff's Office has failed to properly train Defendant's FRANQUI, STACHELEK and BENDER, in how to interact with and provide services to individuals with developmental disabilities.

134.    The failure of Defendant Palm Beach County Sheriff's Office to properly train Defendants FRANQUI, STACHELEK and BENDER in how to interact with and provide services to individuals with developmental disabilities violated Title II of the ADA.

135.    Defendant's violation of Title II of the ADA proximately caused the injuries sustained by the Plaintiff.

136.    As a direct and proximate result of-the-conduct described above, Plaintiff suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment.  These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.      Judgment for compensatory damages;

b.      Judgment for exemplary or punitive damages;

c.      Cost of suit;

d.      Reasonable attorney's fees;

e.      Trial by jury as to all issues so triable; and

f.      Such other relief as this Honorable Court may deem just and appropriate.

<u>COUNT X</u>
**BATTERY AGAINST DEFENDANT FRANQUI**

137.    Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

138.    At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

139.    Defendant FRANQUI's actions by discharging his firearm with a depraved indifference to human life and conscious disregard for the safety of the general public six (6) times as the van was moving away from him, in which three (3) bullets struck JEREMY in the head, shoulder and finger constituted an intentional unwelcome and unprivileged touching of JEREMY, and was undertaken with actual malice.

140.    The conduct of Defendant FRANQUI, in performing a leg sweep maneuver on JEREMY after he shot him from behind three (3) times wherein JEREMY is and was not mentally competent to understand the cause and extent of the injuries that he sustained and the events that had just occurred, constituted an intentional unwelcome and unprivileged touching of JEREMY, and was undertaken with actual malice.

141.    As a direct and proximate result of the conduct described above, Plaintiff suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment.  These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights.  Plaintiff has also agreed to

pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a. Judgment for compensatory damages;

b. Judgment for exemplary or punitive damages;

c. Cost of suit;

d. Reasonable attorney's fees;

e. Trial by jury as to all issues so triable; and

f. Such other relief as this Honorable Court may deem just and appropriate.

## COUNT X
## BATTERY AGAINST DEFENDANT KEITH BENDER

142. Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

143. At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

144. The conduct of Defendant BENDER, aggressively slamming Plaintiff's face into the ground and pinning JEREMY, who was already in handcuffs, face down on the ground, after he had already been shot three (3) times from behind by FRANQUI, and taking into account that he is not mentally competent to understand the cause and extent of the injuries he sustained and the events that had just occurred, constituted an intentional, unwelcome, and unprivileged touching of JEREMY, that was undertaken with actual malice.

145. As a direct and proximate result of the conduct described above, Plaintiff suffered

bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment.  These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.    Judgment for compensatory damages;

b.    Judgment for exemplary or punitive damages;

c.    Cost of suit;

d.    Reasonable attorney's fees;

e.    Trial by jury as to all issues so triable; and

f.    Such other relief as this Honorable Court may deem just and appropriate.

**COUNT XI**
**BATTERY AGAINST DEFENDANT PBSO**

146.    Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

147.    At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

148.    Defendant FRANQUI's actions by discharging his firearm with a depraved indifference to human life and conscious disregard for the safety of the general public six (6) times as the van was moving away from him, in which three (3) bullets struck JEREMY in the head, shoulder and finger constituted an intentional unwelcome and unprivileged touching of JEREMY,

and was undertaken with actual malice.

149.    The conduct of Defendant FRANQUI, in performing a leg sweep maneuver on JEREMY after he shot him from behind three (3) times wherein JEREMY is and was not mentally competent to understand the cause and extent of the injuries that he sustained and the events that had just occurred, constituted an intentional unwelcome and unprivileged touching of JEREMY, and was undertaken with actual malice.

150.    The conduct of Defendant BENDER, aggressively slamming Plaintiff's face into the ground and holding JEREMY face down on the ground, after he had already been shot three (3) times from behind by FRANQUI, was already in handcuffs, and taking into account that he is not mentally competent to understand the cause and extent of the injuries he sustained and the events that had just occurred, constituted an intentional, unwelcome, and unprivileged touching of JEREMY, that was undertaken with actual malice.

151.    Defendants FRANQUI and BENDER were acting within the scope of their employment with Defendant PBSO.

152.    As a direct and proximate result of the conduct described above, Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment.  These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.      Judgment for compensatory damages;

b.      Judgment for exemplary or punitive damages;

    c.      Cost of suit;

    d.      Reasonable attorney's fees;

    e.      Trial by jury as to all issues so triable; and

    f.      Such other relief as this Honorable Court may deem just and appropriate.

<u>**COUNT XII**</u>
**42 U.S.C. §1983  - FALSE ARREST/FALSE IMPRISONMENT CLAIM
AGAINST DEFENDANT FRANQUI**

153.    Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

154.    At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

155.    As set forth above, Defendant FRANQUI, through his direct actions, personally participated in and caused the false arrest/false imprisonment of the Plaintiff.

156.    In as much as Defendant FRANQUI and STACHELEK was fully aware of JEREMY's mental handicap, the actions of Defendant FRANQUI, in causing the arrest of Plaintiff in the absence of probable cause, as set forth hereinabove, were taken in the absence of lawful authority and said actions constitute false arrest and false imprisonment of Plaintiff.

157.    In as much as JEREMY has Down Syndrome, JEREMY lacked the requisite intent to be arrested for any crime.

158.    As a direct and proximate result of the conduct of Defendant FRANQUI, Plaintiff suffered loss of his liberty and freedom, mental anguish, expense of medical care and treatment, was forced to retain the services of legal counsel in anticipation of the filing of criminal charges, and

emotional distress. These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.      Judgment for compensatory damages;

b.      Judgment for exemplary or punitive damages;

c.      Cost of suit;

d.      Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

e.      Trial by jury as to all issues so triable; and

f.      Such other relief as this Honorable Court may deem just and appropriate.

### COUNT XIII
### 42 U.S.C. §1983 - FALSE ARREST/FALSE IMPRISONMENT CLAIM AGAINST DEFENDANT PBSO, Ric L. Bradshaw, in his capacity as Sheriff of Palm Beach County

159.    Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

160.    At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

161.    As set forth above, Defendant FRANQUI, through his direct actions, personally participated in or approximately caused the false arrest/false imprisonment of the Plaintiff.

162.    In as much as Defendant FRANQUI and Defendant STACHELEK, were fully aware of JEREMY's mental handicap, the actions of Defendant FRANQUI, Defendant STACHELEK and Defendant BENDER in causing the arrest of Plaintiff in the absence of probable cause, as set forth

hereinabove, were taken in the absence of lawful authority and said actions constitute false arrest and false imprisonment of Plaintiff.

163.    In as much as JEREMY has Down Syndrome, JEREMY lacked the requisite intent to be arrested for any crime

164.    The false arrest and false imprisonment of Plaintiff by Defendant FRANQUI, Defendant STACHELEK, and Defendant BENDER was committed by Defendants FRANQUI, STACHELEK and BENDER in the course and scope of their employment for Defendant PBSO.

165.    As a direct and proximate result of the conduct of Defendant PBSO, Plaintiff suffered loss of his liberty and freedom, mental anguish, expense of medical care and treatment, was forced to retain the services of legal counsel in anticipation of the filing of criminal charges, and emotional distress. These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.    Judgment for compensatory damages;

b.    Judgment for exemplary or punitive damages;

c.    Cost of suit;

d.    Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

e.    Trial by jury as to all issues so triable; and

f.    Such other relief as this Honorable Court may deem just and appropriate.

### COUNT XIV
### MALICIOUS PROSECUTION Against DEFENDANT FRANQUI

166.    Plaintiff realleges the allegations contained in paragraphs 1 through 66 as if fully set forth hereinagain at length.

167.     At all times relevant and material hereto and at the time of the incident which occurred on October 10, 2010, JEREMY, is a severely mentally disabled person who suffers from Down Syndrome, and has been declared incompetent by a panel of mental health professionals.

168.     Defendant FRANQUI wrongfully caused criminal proceedings to be instituted against Plaintiff with malice and absence of probable cause by submitting police reports to prosecuting authorities containing false statements and/or material, omissions, which reports were relied upon by prosecuting authorities.

169.     Based on these false charges and the elaborate story Defendants, FRANQUI, STACHELEK and BENDER fabricated, the State Attorney had JEREMY evaluated by several medical professionals determined whether or not JEREMY was incompetent.

170.     As a result of these medical evaluations determining that JEREMY was incompetent, the State Attorney decided not to proceed with the filing of charges.

171.     As a direct and proximate result of the conduct of Defendant FRANQUI, Plaintiff suffered loss of his liberty and freedom, mental anguish, expense of medical care and treatment, was forced to retain the services of legal counsel in anticipation of the filing of criminal charges, and emotional distress. These losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff prays for the following relief:

a.     Judgment for compensatory damages;

b.     Judgment for exemplary or punitive damages;

c.     Cost of suit;

d.     Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

e.  Trial by jury as to all issues so triable; and

f.  Such other relief as this Honorable Court may deem just and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

(a)  Declare that Defendants' acts and conduct constituted violations of the Fourth and Fourteenth Amendments of the U. S. Constitution under 42 U.S.C.§§1983.

(b)  Judgment in Plaintiffs' favor as to all claims for relief.

( c )  Award compensatory damages for the injuries JEREMY sustained due to Defendants' conduct for all economic and non-economic damages for medical costs, pain, suffering, humiliation and emotional distress.

(d)  Award punitive and exemplary damages, pre-judgment interest, post-judgment interest, costs, and other reasonable expenses incurred in maintaining this action, and the reasonable attorney's fees and costs incurred in maintaining this action.

(e)  All other relief in law or equity to which the Plaintiff is entitled and that the Court deems equitable, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues within this Complaint.

RESPECTFULLY SUBMITTED THIS 15th DAY OF August, 2014.

**KAPLAN & SCONZO, P.A.**
PGA Financial Plaza
3399 PGA Boulevard, Suite 180
Palm Beach Gardens, Florida 33410
Telephone: (561) 296-7900
Facsimile: (561) 296-7919

By: **/S/ Stuart N. Kaplan**
STUART N. KAPLAN, ESQUIRE
Florida Bar No.: 0647934
**skaplan@kaplansconzolaw.com**
JOSEPH G. SCONZO, ESQUIRE
Florida Bar No.: 0508720
**jsconzo@kaplansconzolaw.com**
Secondary Email: **jwise@kaplansconzolaw.com**
ATTORNEYS FOR PLAINTIFF